May it please the court. Good morning, your honors. My name is Keith Ruttman and I represent the appellant Timothy Strem. I'd like to reserve 90 seconds for rebuttal, if I might, and I'd like to speak up a little bit. Yes, sir. I'd like to take a moment to thank the court for allowing me to participate in this special opportunity as well and hope to do my part to present the very best in advocacy that you're entitled to. Viewed in the light most favorable to the following. On September 24th of 2014, Timothy Strem, a 62-year-old infirm man, needed help. So he did what any reasonable person would do. He called his doctor on the phone asking his doctor for assistance and became aware after six or seven minutes that the police were outside trying to gain his assistance. He was homeless, shoeless, stockless, wearing pajama bottoms, carrying a cell phone in one hand and a bloody napkin in the other. Deputy Willis, one of the two respondents in this matter, was close enough to him to see that he had no visible bulges in his waistband or his pockets. He was compliant. He dropped the phone immediately when being told to do so. He did not try to run and when he saw the handcuffs come out, he held his hands out and asked just simply not to be handcuffed behind his back because quote, my shoulders don't work like that. Not only was he not an immediate threat to these officers, he was no threat at all. Within a matter of seconds, two tried to pull his hands behind his back to handcuff him and as he testified, he stiffened his arms because he knew the pain was coming. He just didn't want to be hurt. They pulled him to the ground. The larger of the two officers fell on top of him, weighing 250 pounds without equipment. His hands were pulled behind his back. He was handcuffed behind his back. He was led to a waiting nearby hospital. How did the officers happen to be there? How did the officers happen? How did the officers happen to be there? His doctor's secretary or assistant called the 911 thinking that because of the course of a telephone conversation, your client indicated two things. One, he was thinking about suicide and two, he had a gun. Correct. That's what was reported to 911. Yes, sir. Yes. Yes. When the officers showed up, they knew those two things. That's correct, Your Honor. They also knew that no crime had been reported. They were there on a welfare check only. They had the opportunity to speak with his son in law who lives in the front house and ascertain if they could what he knew about Mr. Strem's mental health condition and we're not able to gather any further information. Handcuffing in back is standard law enforcement procedure, correct? Yes and no, Your Honor. Yes, it is standard. No. San Diego Sheriff's Department policy allows handcuffs to be placed in the front in in special circumstances, including handicapped prisoners. No further examples are provided by the policy. So while it is standard in this case, it's our position that Mr Strem was willing to be handcuffed. He was willing to go into custody. He was simply only asking not to be handcuffed in a manner that would cause him pain and it would not be. How are the officers supposed to know that his is acting in an aberrant way who might act irrationally? Well, the first way they would know would be from talking to his son in law who told them he had a heart condition and a pacemaker implanted with him. They also saw the disabled or should have seen the disabled placard on his car that was parked in front of his house while they were there waiting for him. Also, simply by the way he moves, Your Honor, he moved. He walks very slowly. He doesn't swing his arms when he walks. It just all his whole physical appearances. Fingers are all not. Aren't you expecting the deputies to have sort of superhuman knowledge? I mean, all they know is it's a scary situation and people do act irrationally and you have a guy that tells them I don't want the normal process, which is handcuffs in the back. Handcuffs in the front do present a heightened risk to the officers. Well, Your Honor, I would point out two things. One, they were able to ascertain that he was not visibly armed at the time, and two, he was being transported by ambulance, not by police car. So he was in the care of medical professionals at that point. Uh, as I indicated to Judge Hawkins, San Diego Police Sheriff's Department policy authorizes the use of handcuffs in front if they need to be used at all, and they didn't know he was unarmed until they went behind him and took him down. Well, they couldn't see any weapons in his hands. They were able to see what he was carrying. And as I've indicated, Deputy Willis was close enough to him to see that there were no visible bulges that might indicate he was carrying a weapon. But yes, we definitely agree that the police were aware that it was a call involving a gun, a gun, and they should be careful and cautious. They weren't aware that he might have had a gun in the back of his waistband, for example. Well, Deputy Myers was off to the corner of the house, and from his vantage point, he could have seen a gun in his waistband in the back. But the way he was dressed, it seems, and this is again why I think a disputed issue of fact requires a jury assessment, the way he was dressed, a gun simply would not stay in his waistband. It would fall out immediately. If he had an intention to commit, to harm himself, he would have done it without coming outside whatsoever. But he came outside and just simply asked the police, you know, please don't hurt me. And I think this Court has addressed that type of situation, maybe not that exact situation, but in Glenn v. Washington County, the Court, it was a mental health case involving an individual, and the Court noted that it would be ironic in doing so. So what's the precise constitutional violation you're arguing today? I gather from your argument that you're saying they should have handcuffed him from the front instead of the back. Is that? That's part of it, Your Honor. I have the constitutional right at issue. And what's your best case for that specific proposition? Yes, Your Honor. I have two cases, Meredith v. Erath and Winterrod v. Nelson. Meredith v. Erath, Mrs. Bybee, I believe her name was, was an occupant of an apartment building where the IRS came to execute search warrants. She simply asked to see the warrant, which is the constitutional right this Court's recognized in United States v. Prescott. And as a result, the officer grabbed her. Because she was insisting on seeing the warrant, the officer agent felt that he was interfering with his ability to execute the warrant, which was the lawful purpose for which he was there, grabbed her by the arms, twisted her arms behind her back, and handcuffed her. That was a tax evasion case. That was a tax evasion case. And there had been no prior warning of a gun involved. True. That's true. But in this case, a tax evasion case is at least a crime. Whereas Mr. Strem was not suspected of any crime whatsoever. Suicide's a crime, isn't it? I guess attempted suicide would be a crime, yes sir. But. Doesn't matter whether it's a crime or not. It's a heightened risk situation. And the public safety issues of having a gun threatening suicide seem to me to be the issue, not whether it's a crime or not. Well, yes. The fact that they are on heightened alert is certainly important. I'm not suggesting they shouldn't have been. What I'm suggesting is that once they took in all the information that was there was no legitimate law enforcement purpose in pulling him down to the ground and falling on top of him and handcuffing him in a painful manner when he agreed to go into custody. And at that point, the officers decided that they were going to take Mr. Strem into custody.    I see my time is up. Thank you very much. We'll hear from the county. Thank you, Your Honors. May it please the Court. My name is Ronald Leonard. I represent the county of San Diego and the defendants in this case. This is a case involving qualified immunity and excessive force. The Supreme Court and this circuit have upheld that protecting government officials from civil damages is important to society as a whole. The high court has frequently stated that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. The deputies in this case were neither. There are six uncontested material facts that are critical in granting qualified immunity in this case. I would like to identify those facts and then review the two-part test that the court applies for qualified immunity. There is no dispute over the genuine issues of material fact. One, Mr. Strem was agitated when interacting with the deputies. Mr. Strem himself testified. They would have quickly realized I was just upset and nothing more. The receptionist that took the call and reported it to 911 and both deputies have also testified that he was clearly upset and agitated. Two, the deputies were told that Mr. Strem was possibly suicidal. The facts, the truth of the matter, does not impact the fact that they were both told this information. The dispatch radio confirms Mr. Strem presents a possible suicide threat and both the deputies have testified. That is what they heard and that influenced their approach to Mr. Strem. The actual physical confrontation when the officers came into visible contact with Mr. Strem, was it inside or outside? It was outside, Your Honor. It was about two feet outside the entrance door to his residence. But at all times, he was within those two feet of the door. And the deputies were also concerned that he could quickly step back in. It's a simple question, it was outside? Outside, Your Honor. Just outside the door. Yes, sir. Third. A dispatch had told the officers that he had said, I have a gun. Yes, Your Honor. I thought the record indicated also that he had his hands to his side and he was sort of firming up and not cooperating with his hands being placed behind him. Is that accurate? That is accurate, Your Honor. Another uncontested fact is that Mr. Strem was not complying with instructions to be handcuffed. There is no evidence in the record that he ever put his hands in front. The evidence in the record is his own testimony. I put my hands as tight against my body as I could. Mr. Strem pinned the hands around his waist and would not let them be guided. Nobody testified that there was a visible gun, correct? That is correct, Your Honor. Fourth, Mr. Strem appeared at the door holding a bloody napkin. Mr. Strem did not tell anyone whose blood it was. And sixth. I think he said he coughed up blood, didn't he? He does explain that, but he never articulated that to the deputies on scene. And their concerns were that he could have self-injured, or there could have been another victim on scene, and accentuated their concerns to secure. Didn't he testify that he said, I've been coughing up blood for the officers? He, his testimony was not clear as to when in time he would have said that. But from looking at the rest of the record, what the deputies heard him say, he did not discuss that until after he was already in handcuffs and in custody. So that's a potentially disputed fact, true? No, Your Honor. He appeared at the doorstep. When he told the officers he'd been coughing up blood. To the extent that it is, Your Honor, it's not a material fact. The material fact is that he presented on the doorstep holding a bloody napkin. Whether he tried to explain it, whether the officers should have believed his explanation, is immaterial to the fact that he presents a situation with, that gives those indicators to the officers. But we are here on this interlocutory appeal. We're not here to resolve facts. Correct, Your Honor. That's why I think it's important to identify the six facts that there is no dispute about, and to derive a lot from the facts that we all agree to. But my notes indicate he told the deputies he had been coughing up blood. You were the one who identified the undisputed fact. That's why we're asking the questions about the blood. You said it could have been from self-inflicted suicide that was undisputed. But his version is, I believe, that he told the deputies he'd been coughing up blood. So. Your Honor, I believe the record indicates that that happened after he was arrested. However, the deputies, even if he had indicated that at the beginning of the interaction, had no obligation to believe him. They were already there under concerns. Well, the case law is clear that an individual, Rodriguez v. Farrell, which is 11th Circuit, police officers need not credit injury or stories of injuries being reported to them by an individual. But even if that had been clearly communicated, they still had the known fact that there was blood present. And then they had to assess whether they were to believe the story about where it came from. There were no cuts apparent on his body, true. True. Six, the handcuffing and takedown caused Mr. Strem no lasting or permanent injury. Mr. Strem declared that he would testify that the pains he suffered did not quickly dissipate, but will agree that the injuries were not lasting nor permanent. These are the facts that the parties do not dispute. It's not a negligence case. It's not a police practices case. Any of the disputes that Mr. Strem brings up are not material. Isn't it really more of a resisting case than anything else? If you have deputies there, they're trying to do their job. They can't function in a situation where someone resists a lawful order by using physical force to hold their hands in a particular situation. That puts them in an impossible situation. Wouldn't you agree? I would agree, Your Honor. So, isn't it more about the fact that the background was there was this weapons issue, there was concern for him. But on top of all of that, he was just simply not complying. I would agree with the court very much so. And in fact, the plaintiffs also agree, Mr. Strem agrees that at the time Mr. Strem exited the house, there was legal justification to take him into custody. Let me ask a broader question, if I might. We have a lot of cases of alleged excessive violence, excessive force, that involved police officers responding to reports of somebody who's suffering some mental problems. So what standard would you say we should apply in those cases that might be different from the cases involved with an ordinary crime? Because it's often argued in those cases that police officers have different obligations in responding to situations in which somebody is exhibiting some mental problems, whether it's suicidal or whether it's acting out, and so forth. So what standards do you think should apply in this type of case to those situations? That's a difficult question, Your Honor. I would begin by stating that Mr. Strem himself disclaims that he had any mental health illnesses or issues. Right, but we're talking about what the objective, we're applying an objective standard to what the officers did. So they've been told there's a potentially suicidal person. He says, I'm not suicidal, I don't have any problems. But the objective officer goes in there saying he's potentially suicidal and he may have a gun. But what, so what standards should apply in that circumstance where there's not a crime being, necessarily a crime being committed or alleged, but they're responding to a public safety issue? That's a difficult question to answer because it would be so fact driven by what is presented to the officers, the depth of mental health issue, and what they should have been aware of. Does the county of San Diego have any such standards that govern police actions? They do, Your Honor. But the first step that must be taken is the scene must be rendered safe before they can try to accommodate whatever the disability that is being presented is. In this case, with the concerns they had about the gun and the suicide and his resisting arrest, they could not render him safe in order to fully assess or accommodate whether there was a mental health issue. So there are standards. Yes, Your Honor. That are different. You said, you said, in answer to my question, I thought it would depend on the factual circumstances. But my broader point is, I believe there are different standards that apply to these types of situations. I agree to that. As to the two prongs of the test for qualified immunity, Mr. Strem does not show that the deputies violated any constitutional right. Case law holds that you cannot define it at a high level of generality, such as the right to be free of excessive force. But more importantly, on the second prong, you must prove both of them before arguing that these deputies should be stripped of their qualified immunity. He has not identified a clearly established right the deputies would have knowingly violated in their decision to take down Mr. Strem, given these factual circumstances. Thank you, counsel. We'll give you a minute for rebuttal. What, sorry? Yes, I said we'll give you a minute for rebuttal. Our questions took you through your time initially. Sorry. Mr. Strem was compliant. He testified at his deposition, that's at page 84 of the record, that he held his hands out. Told them he was willing to be handcuffed, and just please ask them not to handcuff him behind his back. Deputy Myers testified at his deposition that he does remember Mr. Strem talking about coughing up blood, which would explain the bloody napkin. There was certainly no, the officers never heard any indication of a gunshot or anything like that. Unnecessary pain is the benchmark according to, I believe, Hudson versus McMillan, by which Fourth Amendment cases are to be assessed. And lastly, the mental health standard, it's simply a factor under this court's precedent that should be considered by a police officer. We believe there are disputed issues of material fact, and that the law is clearly established in the cases I cited earlier, as well as in my brief. Thank you very much. Thank you, counsel. The case just heard will be submitted for decision. Thank you both for your arguments this morning.
judges: Hawkins, Thomas, Pregerson